J-A19041-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: S.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: N.G.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 450 MDA 2022 |

Appeal from the Order Entered February 22, 2022
In the Court of Common Pleas of Dauphin County Juvenile Division at
No(s): CP-22-DP-0000094-2020

| IN RE: S.M.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: N.G.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 454 MDA 2022 |

Appeal from the Decree Entered February 10, 2022
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s): 151-AD-2021

BEFORE: BOWES, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: AUGUST 1, 2022**

N.G.H. ("Mother") appeals from the order and decree entered in the

Court of Common Pleas of Dauphin County, which changed the permanency

goal to adoption with a concurrent placement goal of subsidized permanent

_____

[*] Former Justice specially assigned to the Superior Court.

legal custodianship, and involuntarily terminated Mother's parental rights to her minor daughter ("the Child").[1]  After a careful review, we affirm.

The relevant facts and procedural history have been set forth, in part, by the Orphans' Court as follows:

> The Child [(born in July of 2020)] was placed in the care and custody of the [Dauphin County Social Services for Children and Youth ("the Agency")] on August 28, 2020, when she was just five weeks old. The Child has continuously lived with a foster care family since that date.  On September 9, 2020, following a hearing, the Child was adjudicated dependent and placed in the Agency's legal custody.
>
> [T]he Agency has a history with Mother dating back to 2015 when another child born to her, J.H. [(born in August of 2015)], was adjudicated dependent and placed in the Agency's care and custody.  On August 8, 2017, Mother's parental rights to J.H. were involuntarily terminated following a hearing before the…Orphans' Court.  During this prior involvement with the Agency, Mother was diagnosed with Bipolar Disorder and Schizoaffective Disorder[,] and [she] tested positive for opiates, Oxycodone[,] and benzodiazepines.
>
> [I]n the current case, the Child was born…slightly premature.  At the time, Mother was [thirty-four] years old[.] The current proceedings arose when the Agency received a referral two days following the Child's birth from a source expressing concerns about Mother's mental health and illegal drug use.
>
> Two drug screens of Mother, on July 28, 2020, and August 5, 2020, revealed positive results for benzodiazepines, Oxycodone, and marijuana.  At that time, Mother had a prescription for Oxycodone and for a medication that contained benzodiazepines.
>
> During the second week of August 2020, the Child was discharged from the hospital to Mother's care.  On August 18, 2020, the Agency received a referral regarding Mother's

---

[1] The parental rights of "Unknown Father" were also terminated. "Unknown Father" is neither a party to this appeal nor has he filed his own appeal.

paramour, [Vernon] Jameson[.][2] Following a police interaction,...[Mr. Jameson] was arrested and the Child was released to Mother's custody[.]

On August 28, 2020, the Agency received a referral following a report that Mother was leaving the five-week-old Child home alone. Additionally, [the Agency received a] report that Mother appeared to be under the influence of drugs or alcohol. That same day, Agency personnel, accompanied by Pennsylvania State Police Troopers, visited Mother's home. Based upon their observations and discussions with Mother, the Troopers took protective custody of the Child, who was then released to the Agency's temporary custody[.] Mother submitted to a urine screen and tested positive for fentanyl, marijuana, and benzodiazepines.

On August 31, 2020, the Agency filed a dependency petition due to concerns regarding Mother's ongoing substance abuse. The Agency also filed a motion for a finding of aggravated circumstances under the Juvenile Act[3] due to Mother's prior involuntary [termination of parental rights] as to J.H. in 2017. Following a shelter care hearing, the Child was formally placed in the Agency's temporary care and custody. The Juvenile Court further ordered that all visitation between Mother and the Child be supervised.

On September 9, 2020, following a hearing, the Child was adjudicated dependent and placed in the Agency's care and custody. The Juvenile Court adopted the Agency's proposed service objectives listed in the pre-dispositional statement…and further ordered Mother to obtain a psychological evaluation and follow through with all recommendations[.] Aggravated circumstances were also found to exist as to Mother because her parental rights had been previously involuntarily terminated as to J.H. *See* 42 Pa.C.S.A. § 6341(c.1). As such, the [Juvenile] Court ordered that the Agency was relieved of efforts of reunifying the Child and Mother. Nevertheless, the [Juvenile Court] directed, in the dependency order, that the concurrent placement goal was for the return of the Child to Mother and adoption.

---

[2] Mother previously identified Mr. Jameson as the Child's biological father; however, a paternity test revealed Mr. Jameson is not the Child's biological father. The Child's biological father is unknown.

[3] Pennsylvania Juvenile Act ("Juvenile Act"), 42 Pa.C.S.A. §§ 6301-6375.

Thereafter, Mother was granted the right to supervised visits with the Child twice per week at the Northern Dauphin Human Services Building in Elizabethville, PA.

On October 21, 2020, the Agency made a referral for It Takes A Village to conduct extensive family findings for the Child. It Takes A Village completed its family findings report on November 5, 2020. On December 17, 2020, the Agency facilitated the Family Group Conference in an effort to locate a kinship placement. No appropriate kinship care was found at that time.

On November 20, 2020, in compliance with the Juvenile Court's order of September 9, 2020, Mother completed a psychological evaluation with Dr. Mackenzie Walker.

Between January 8 and 27, 2021, Mother successfully obtained inpatient treatment at Malvern Treatment Center where she participated in psychotherapy groups, 12-step meetings, and individual counseling. Upon discharge, Mother was recommended to participate in outpatient treatment and 12-step meetings.

On January 12, 2021, at the first Permanency Review hearing before a hearing officer, the Child was held to remain dependent and continue in the Agency's care and custody. The Juvenile Court found that Mother [was] in minimal compliance with her permanency plan and issued the following orders:

i.      Mother is to confirm attendance of her visit with the Child by 8:00 a.m. on the morning of a visit.

ii.     Mother is to provide the name of her primary care physician to the Agency.

iii.    Mother is to provide a copy of her medical marijuana card to the Agency.

The Juvenile Court noted that the concurrent plans in place would remain, which included return of the Child to Mother and adoption.

On March 3, 2021, Mother completed a drug and alcohol evaluation at the Naaman Center in Elizabethville, [PA]. Mother was recommended to participate in outpatient drug and alcohol counseling.

On March 18, 2021, Mother completed an intake at the Pennsylvania Psychiatric Institute ("PPI"). Due to her refusal to sign a release for PPI, the Agency was not aware whether she attended this intake appointment or engaged in any therapeutic services or medication management.

Beginning the week of May 16, 2021, Mother's visitation was reduced from twice a week to once a week at the Northern Dauphin Human Services Building due to Mother's inconsistent attendance.

On June 1, 2021, Mother moved from Elizabethville to Carlisle, PA. As a result, Mother was discharged from Keystone's case management service and recommended to contact Cumberland County Case Management. In addition, Mother's supervised visitation was changed to Child First Visitation Center in Harrisburg, PA.

On July 1, 2021,…Mother's landlord in Carlisle issued her a 15-day eviction notice due to the home's condition. The landlord had previously given her notice to clean up the home. A Landlord/Tenant action was later commenced and a judgment entered against Mother for $1,603 for arrears and physical damage to the property.

On July 22, 2021, Mother was unsuccessfully discharged from the Naaman Center where she was receiving drug and alcohol treatment.

On August 16, 2021, Mother revoked her release from the Pinnacle Health's REACCH Program, which had allowed [the program] to disclose information to the Agency. As a result, cross systems meetings were cancelled.

On September 1, 2021, the Agency filed a motion to suspend visitation because of Mother's inconsistency. On September 7, 2021, [the Juvenile Court] granted the motion to suspend visitation until further ordered. Mother was formally discharged from Child First Visitation Center on September 12, 2021, due to [her] inconsistent attendance.

On September 27, 2021, Mother reported that she had moved from Carlisle to Shippensburg, PA.

On November 1, 2021, an Agency caseworker learned that Mother had been hospitalized at UPMC Harrisburg Hospital on October 30, 2021, under a voluntary "201" commitment due to self-harm concerns. She was awaiting bedspace for an inpatient psychiatric facility.

On November 3, 2021, at the Second Permanency Review hearing, [t]he Court found that the Child remain[ed] dependent and continue[d] in the Agency's care and custody. The Court further found that Mother had no compliance with her permanency plan and directed that visitation would remain suspended.

Orphans' Court Opinion, filed 4/13/22, at 2-6 (footnotes added) (citations to record omitted).

On December 23, 2021, the Agency filed a petition seeking a hearing to change the court-ordered goal to adoption pursuant to the Juvenile Act. Further, on this same date, the Agency filed a petition to involuntarily terminate the parental rights of Mother under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

The Orphans' Court combined the matters and held a hearing on February 10, 2022. At the hearing, the Child, who was approximately nineteen months old, was represented by Sarah E. Hoffman, Esquire. Amy Kaunas, the Child's newly appointed guardian *ad litem*, was also present.[4]

---

[4] Attorney Hoffman was the Child's guardian *ad litem* for the dependency proceedings. On February 7, 2022, Attorney Hoffman filed a petition seeking to be appointed as legal counsel for the Child during the termination proceedings. She averred there was no conflict between the best and legal interests of the nineteen-month-old Child. The Orphans' Court granted the petition, and thus, Attorney Hoffman represented the Child as the guardian *ad litem* and legal counsel during the hearing. Moreover, Attorney Hoffman noted for the record that Amy Kaunas would be taking over the Child's case as the new guardian *ad litem* for any future proceedings, and Ms. Kaunas was also present in the courtroom. N.T., 2/10/22, at 5.

Our Supreme Court has instructed this Court to verify that the trial court appointed counsel to represent a child's legal interest in a contested termination of parental rights hearing pursuant to 23 Pa.C.S.A. § 2313(a), and if counsel served in a dual role as guardian *ad litem*, that the trial court determined before appointment that there was no conflict between a child's best and legal interests. *See In re Adoption of K.M.G.*, ___ Pa. ___, 240 A.3d 1218 (2020). If a child is "too young to be able to express a preference as to the outcome of the proceedings," there is no conflict between a child's
*(Footnote Continued Next Page)*

Mother was present at the hearing via video and represented by Michael Matter, Esquire.

At the hearing, Jamie Marberger, who has been the Child's foster mother since August of 2020, testified the Child attends daycare regularly, has no health issues, and has no developmental issues. N.T., 2/10/22, at 7. Ms. Marberger testified the Child calls her "Mommy" and calls her husband "Da-da." *Id.* at 8. She and her husband, who is the Child's foster father, take the Child to her medical appointments and put her to bed each night. *Id.*

Ms. Marberger testified she has a close bond with the Child and spends a lot of time with her. *Id.* When the Child is hurt, she seeks comfort from Ms. Marberger. *Id.* She confirmed the Child has not had recent visitation with Mother. *Id.* at 8-9. She indicated she and her husband love the Child, who has become "part of the family." *Id.* at 9. Ms. Marberger testified she would support the Child in participating in activities as she matures. *Id.* She indicated the Child has her own room with a crib and toys, and she has spent every holiday with the foster family since her placement with them. *Id.*

Ms. Marberger testified she is a bank teller while her husband is a drafter. *Id.* at 10. She indicated that she and her husband have a ten-year-

---

legal and best interests. ***See In re T.S.***, 648 Pa. 236, 192 A.3d 1080, 1092-93 (2018).

Here, given the Child's age, we conclude the Orphans' Court complied with ***T.S.***, ***supra***, and ***K.M.G.***, ***supra***, in granting Attorney Hoffman's request to act as the Child's guardian *ad litem* and legal counsel during the hearing.

old biological son, as well as a four-year-old foster son, who live in the home with them. *Id.* Ms. Marberger testified the two boys get along well with the Child, and they have taken on the role of being "big brothers." *Id.*

Pennsylvania State Police Trooper Tavin Davis testified that, on August 17, 2020, the police received a 911 call of a possible kidnapping. *Id.* at 13. Specifically, a 911 dispatcher reported "an older black male was running down the center of the road and in Elizabethville borough…carrying a baby carriage. And he had a—a black female chasing him, screaming, Give me my baby back." *Id.* at 13-14.

Trooper Davis responded to the scene in "less than 50 seconds[,]" and he saw a black male, who was later identified as Mr. Jameson, carrying a baby carriage. *Id.* at 14. He removed the baby, who was later identified as the Child, from Mr. Jameson's possession and handed her to the woman, who was later identified as Mother. *Id.*

Trooper Davis testified that, at the scene of the incident, Mr. Jameson admitted he and Mother had been drinking alcohol. *Id.* at 15. Based on his training and experience, Trooper Davis also believed Mr. Jameson and Mother were under the influence of illegal drugs. *Id.* at 15-17. He noted each accused the other of being under the influence of drugs at the time of the incident, and Mother admitted she had used illegal drugs in the past. *Id.* at 17.

Trooper Davis noted the Child was one month old when the incident occurred, she was crying, she was dressed only in a diaper, and she was not secured in the baby carriage. *Id.* at 16. Furthermore, Mother and Mr. Jameson were screaming and fighting with each other to the point that officers had to separate the pair. *Id.* at 17. Trooper Davis indicated Mr. Jameson was arrested and charged with various offenses in connection with the incident while Mother was permitted to leave the scene with the Child. *Id.* at 17-18. However, because of his concerns that Mother was under the influence of a controlled substance, he called the Childline. *Id.* at 18.

Trooper Davis testified that, on August 28, 2020, he went to Mother's home in response to a report that Mother was leaving used drug needles on the floor where the Child would have access to them, as well as engaging in prostitution inside of the residence. *Id.* at 21. Upon arrival at the residence, Trooper Davis was met with a "strong urine smell," which existed throughout the residence. *Id.* at 22. The residence also smelled of cigarette smoke and had cigarette butts lying throughout. *Id.* He observed drug paraphernalia, saw pill bottles that did not contain Mother's or Child's names, and heard the Child crying. *Id.* at 21-23. The police took emergency physical custody of the Child and then turned her over to the Agency. *Id.* at 23. Specifically, the trooper provided the following testimony as to why the police took immediate custody of the Child:

> There were several other things going on in the residence
> aside from the drug paraphernalia, the containers of controlled

substances that weren't--that weren't [prescribed] to [Mother]. There were individuals in the residence—just from conducting hundreds of criminal investigations, there were indicators that appeared to be consistent with human trafficking. No one in the residence knew each other's name. There was a gentleman in the residence who was from New York. There were two other—two other females in the residence who both appeared to be under the influence, aside from [Mother] who appeared to be under the influence as well.

The best characterization I could provide for all three individuals was that they were what's—what's known in police lingo as kind of on the nod. Slow raspy speech, incoherent, and you know, those were just indicators of potential drug use in the house.

And during the course of my involvement on the scene, I asked those individuals about drug use and all three admitted that they were addicted to heroin, which was one of the main concerns I had which led to my feeling [that the Child] was not safe in that residence and signing the documents over to [the Agency].

*Id.* at 24.

Trooper Davis noted Mother, who admitted to being a heroin addict, was incoherent, nodding off, and incapable of caring for the Child. *Id.* at 25, 28. He noted Mother was unable to tell him the names of the people in her home, and the people were unable to provide identification. *Id.* at 26.

The trooper noted that, after this incident, he had another interaction with Mother when he stopped a vehicle in which she was a passenger. *Id.* at 27. He indicated that Mother was in a vehicle with three males, but she was unable to provide any of the males' names. *Id.*

Alyssa Felty, who was a caseworker at the Agency, testified the Agency received a report on July 22, 2020, expressing concern about Mother's "mental health and past drug use." *Id.* at 35. Ms. Felty testified she responded to

Mother's home on August 28, 2020, and Mother seemed to be under the influence of an illegal substance. *Id.* at 41.

Ms. Felty indicated the house smelled from urine and dirty diapers. *Id.* at 36. She noted the Child's pack-and-play contained inappropriate items, such as a bottle of baby wash and ashes from either cigarettes or marijuana. *Id.* at 37-38. She explained the pack-and-play also contained a "substantial size blanket" which posed a suffocation risk to the Child. *Id.* at 42. Further, she noted the home's stove was dirty with old food and a cigarette left on it. *Id.* at 39. The home's floor was strewn with empty alcohol bottles, a baby bottle, and a lighter. *Id.* The Child's crib had no sheets on the mattress. *Id.*

Ms. Felty testified that, as part of her goals, Mother was to provide twice weekly urine samples; however, she did not comply. *Id.* at 47. She noted that, of the eighty-two urine samples Mother was to provide, she provided only thirty-one samples, all of which returned a positive result for at least one controlled substance. *Id.* Specifically, thirty of the samples tested positive for THC, one sample tested positive for barbiturates, two samples tested positive for fentanyl, six samples tested positive for methamphetamines, six samples tested positive for amphetamines, eleven samples tested positive for benzodiazepines, one sample tested positive for alcohol, eight samples tested positive for MDMA, one sample tested positive for Oxycodone, and one sample tested positive for cocaine. *Id.* at 47-48.

Ms. Felty noted Mother's last drug screen was conducted on June 24, 2021, and her urine tested positive for methamphetamines, amphetamines, and THC. *Id.* at 49. Ms. Felty testified that Mother told her she had a medical marijuana card; however, when Ms. Felty asked to see the card, Mother indicated it had been lost or stolen. *Id.* at 50.

Ms. Felty testified that, prior to the Agency's involvement in this case, Mother was treated for drug and alcohol abuse at the Genesis House. *Id.* On January 8, 2021, Mother was admitted to Malvern Treatment Center, and she was successfully discharged on January 27, 2021. *Id.* at 51. On March 3, 2021, the Naaman Center performed an evaluation of Mother and recommended weekly outpatient drug and alcohol counseling. *Id.* at 50. Mother participated in five sessions, and on July 22, 2021, she was discharged as unsuccessfully completing the program. *Id.*

Ms. Felty testified Mother has a history of arrests for prostitution, and during Ms. Felty's interaction with Mother, she observed "multiple men in and out of her home." *Id.* at 56. Ms. Felty indicated the Agency had concerns about Mother's mental health dating back to 2015. *Id.* at 59.

On November 20, 2020, Mother submitted to a psychological evaluation as part of her service objectives. *Id.* As a result, in addition to receiving drug and alcohol treatment, it was recommended that Mother receive outpatient behavioral health services, participate in parenting classes, find employment, participate in medication management, and maintain progress so as to show

she is able to care for the Child. ***Id.*** at 59-60.  Ms. Felty testified that, despite the Agency providing services, Mother did not successfully complete any of the recommendations. ***Id.*** at 60-61.  Ms. Felty noted that several service groups attempted to assist Mother; however, Mother did not consistently provide information as to "her whereabouts[,]" did not consistently attend scheduled appointments, including for mental health services with T.W. Ponessa, and on one occasion "cursed out staff" members.  ***Id.*** at 62-64.

Ms. Felty testified Mother attended a scheduled visit with the Child on June 24, 2021; however, she failed to appear for the scheduled visits in July and August.  ***Id.*** at 54.  When Mother visited the Child, the Child cried and could not be consoled.  ***Id.*** at 55.  In September of 2021, the Agency filed a request that Mother's visitation be suspended due to her inconsistency in visitation and lack of communication with the Agency, and Mother did not file a response to the motion.  ***Id.*** at 54-55.  The court granted the Agency's request.  ***Id.*** at 55.

Ms. Felty indicated the Agency did not hear from Mother until November or December of 2021, when Mother asked if her visits could be reinstated.  ***Id.*** However, after the Agency determined Mother's parental rights had been involuntarily terminated as to a different child, the court relieved the Agency of further reunification efforts due to "aggravating circumstances."  ***Id.*** at 57.

In any event, Ms. Felty indicated Mother has "refused to be a parent [to the Child] throughout the life of this case[.]" ***Id.*** at 66.  For example, Mother

did not send the Child any cards, attend any of the Child's medical appointments, or acquaint herself with the Child's daycare. *Id.* Mother did not consistently telephone the Agency or the foster parents to inquire about the Child's welfare. *Id.* She noted Mother refused to sign releases so that various treatment providers could provide the Agency with information regarding Mother's mental health and addiction problems. *Id.*

Ms. Felty testified Mother has been unable to rectify the issues, which brought the Child into the care of the Agency. *Id.* at 67. For example, Mother has not been able to maintain her sobriety and fails to understand she has mental health issues that need to be addressed. *Id.* Ms. Felty opined it would be in the Child's best interests for Mother's parental rights to be terminated.[5] *Id.* She also opined it would be in the Child's best interests for the goal to be changed to adoption because the Child needs permanency, which Mother is unable or unwilling to provide. *Id.* at 68.

Ms. Felty testified that, since the time the Child has been placed with the foster parents, her medical appointments are "up to date," her needs are being met, she is engaged in age-appropriate activities, and she attends daycare. *Id.* at 70. The Child has displayed no developmental delays. *Id.*

Mother testified she has had a problem with Oxycodone, but she has "been clean of that for three full years." *Id.* at 93. Mother explained that her

---

[5] She further opined it would be in the Child's best interest for the "Unknown Father's" parental rights to be terminated. *Id.*

mother was murdered two years ago due to domestic violence, so she knows the pain of being raised without a mother. *Id.* at 94. Thus, she "want[s] to be a part of [the] Child's life." *Id.*

She explained she and Mr. Jameson had domestic violence issues, and he "introduced [her] to methamphetamine." *Id.* On the day Mr. Jameson tried to kidnap the Child, Mother no longer wanted to "be with him[.]" *Id.* at 95.

Mother admitted she smokes marijuana; however, she can "legally smoke it." *Id.* She testified a doctor at Mechanicsburg Pain Management prescribed marijuana to her for anxiety, but she could not remember the doctor's name. *Id.* at 100-01. Mother indicated she was allowed to have "a beer or two," and this does not make her "a bad mom." *Id.* She admitted she has a bipolar disorder, but this does not mean "that [she] can't have a normal life." *Id.* at 96. She testified a doctor at Sadler Health prescribed her medications for her mental condition, but she could not remember the name of the doctor. *Id.* at 101-02.

Mother testified she did not attend visitation because she could not afford the cab fare. *Id.* at 95. She asked her cousin for money; however, the cousin could not oblige. *Id.* at 96. She indicated she asked the Agency for help, but the Agency would not assist her. *Id.* She claimed Ms. Felty would "make fun of [her]" and tell her to "take [her] medicine." *Id.* at 100.

Mother asked the Orphans' Court to give her an "extension" because she has secured housing at a hotel, as well as a job as a maid at the hotel. *Id.* at 98. She indicated she receives weekly mental health treatment, and she would be willing to submit to weekly drug tests. *Id.* Mother indicated her cousin would be willing to be a resource for the Child; however, her cousin did not attend the hearing since she has not completed the process of receiving clearance to be a foster parent. *Id.* at 99.

At the conclusion of the testimony, Attorney Hoffman, on behalf of the Child, argued it would be in the best interest of the Child for Mother's rights to be involuntarily terminated. *Id.* at 104. The Orphans' Court took "judicial notice of the bond between [the] Child and the foster parents." *Id.* at 105.

By order and decree entered on February 10 and 22, 2022, the Court directed the goal be changed to adoption with a concurrent placement goal of subsidized permanent legal custodianship, and the court held that termination of Mother's parental rights was proper under Subsections 2511(a)(1), (2), (5), (8), and (b).

Mother filed timely counseled notices of appeal, as well as a contemporaneous Pa.R.A.P. 1925(b) statement. On April 13, 2022, the Orphans' Court filed a Pa.R.A.P. 1925(a) opinion, and on appeal, this Court *sua sponte* consolidated Mother's appeals.

On appeal, Mother sets forth the following issues in her "Statement of Questions Presented" (verbatim):

1. Whether the [Orphans'] Court abused its discretion and committed an error of law when it found, despite a lack of clear and convincing evidence, that enough grounds existed for a termination of [Mother's] parental rights under Section 2511(a) of the Adoption Act, 23 Pa.C.S.A. § 2511(a)[?]

2. Whether the [Orphans'] Court abused its discretion and committed an error of law in determining it would be in the child's best interest to have parental rights terminated, when it failed to consider the child's developmental, physical and emotional needs and welfare, thus contravening Section 2511(b) of the Adoption Act, 23 Pa.C.S.A. § 2511(b)[?]

Mother's Brief at 7 (suggested answers omitted).

Mother's issues are intertwined. Specifically, she avers the Agency did not provide clear and convincing evidence in support of termination under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8) or in support of finding that termination would be in the Child's best interests under 23 Pa.C.S.A. § 2511(b).

In matters involving the involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the [orphans'] court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The [orphans'] court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to [orphans'] courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 9 A.3d 1179, 1190 (2010)].

- 17 -

*In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013).

"The [orphans'] court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the [orphans'] court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Subsection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Subsection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Subsection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quotation omitted).

In the case *sub judice*, the Orphans' Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the Orphans' Court as to any one Subsection of 2511(a), as well as Subsection 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's termination decree pursuant to Subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to Subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b) (bold in original).

With regard to termination of parental rights pursuant to Subsection 2511(a)(2), we have indicated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for [her] physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quotation omitted). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *See id.*

Instantly, in finding grounds for termination of Mother's parental rights, including pursuant to Subsection 2511(a)(2), the Orphans' Court reasoned:

> Mother was provided with resources which would have eventually allowed her to increase contact with the Child had she utilized them. Mother failed, however, during the course of the Child's placement to adequately obtain substance abuse treatment and address her mental health problems….[A] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in [her] path to maintain the parent-child relationship.
>
> The credible evidence presented was that Mother's substance abuse and mental health were the primary stumbling blocks in her ability to parent. Mother failed numerous times to comply with treatment programs and recommendations to

address these issues, including her failure to show up for outpatient treatment with Naaman Center (for substance abuse counseling), missing seventeen out of twenty-two weekly appointments, even though they were held remotely. Mother additionally failed to complete almost all of Dr. Walker's recommendations, including successful completion of outpatient therapy, completion of a drug and alcohol program (except for Malvern), completion of an evidence-based parenting program, and finding employment. Mother also failed to follow through with mental health services provided by T.W. Ponessa when she did not attend a rescheduled exam and was belligerent with staff. Mother also hindered the Agency's ability to monitor her progress with various providers by refusing treatment releases or revoking releases previously granted.

***

Additionally, Mother failed to complete almost all of the service objectives directed of her by Court Order including overall compliance with the Agency, completion of drug and alcohol evaluations and following recommendations, failing dozens of times to provide random and scheduled urine screens, failing to obtain stable housing for herself and the Child, failing to successfully complete a parenting program, failing to attend medical appointments with the Child, failing to continue to participate with previously established service providers, and sign all release of information forms requested by the Agency.

The evidence…established under (a)(2) that the Child has been "without essential parental care, control, or subsistence necessary for [her] physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." As noted above, since August 28, 2020, the Child has been without essential parental care, control[,] or subsistence necessary for her physical or mental well-being. Furthermore, the record reflects that the failure of essential parental care has been primarily caused by Mother's lack of adequate treatment for her drug addiction and mental health incapacity, which have not been remedied by Mother to date and which [the Orphans'] Court believes she would be unable to remedy in the future. Despite being provided many resources and encouraged and/or directed to comply by the Agency and Court, Mother has failed to address these significant impediments, as outlined above….[A]t a minimum, the affirmative duty requires that the parent show a willingness to cooperate with [the Agency] to obtain the rehabilitative services necessary to

enable the parent to meet the duties and obligations inherent in parenthood.

***

[Although Mother claims she is ready, willing, and able to parent the Child,] the record fails to reflect any credible evidence that, as of the date of the [termination of parental rights] hearing on February 10, 2022, Mother was ready, willing, and able to parent the Child and provide the [C]hild with the essential parental care, control, and subsistence now, or in the very near future. The evidence…reflects the opposite. Similarly, no evidence supports Mother's claim that the conditions that led to the removal and placement of the Child no longer existed or were substantially eliminated. Instead, the record reflects that Mother has accomplished next to nothing between August 28, 2020, and the [termination of parental rights] hearing [to suggest] she is successfully addressing her history of drug addiction and mental health issues. Mother has failed to show any progress establishing stability with housing and employment; as of the [termination of parental rights] hearing, she was living in a hotel and had lived in at least four residences in the last year and a half. She has further hidden information from the Agency, refusing to communicate with [the Agency] about her housing situation (so it could make a home visit), and also, on a few occasions, refusing or revoking releases for treatment providers so as to prohibit the Agency from assessing her status and compliance.

***

Mother…[contends] that the [Orphans'] Court erred by failing to make reasonable accommodations for Mother's supervised visits. Mother claimed that after she moved from Elizabethville to Carlisle in June of 2021 she had difficulty obtaining transportation to meet with the Child at the new meeting facility in Harrisburg. The credible evidence was that…the Agency…made multiple efforts to inform Mother that she could obtain public transportation…to attend the visitations but that Mother failed to follow through. In any event, the record reflected that prior to moving Mother had attended only thirteen of thirty scheduled visits held while she was still living in Elizabethville. As such, the record does not support her claim that a lack of transportation was the reason for her missed visitations.

Orphans' Court Opinion, filed 4/13/22, at 22-25 (quotation marks and quotations omitted).

We find no abuse of discretion or error of law. The record reflects Mother has continuously demonstrated an unwillingness to cooperate with mental health and child welfare providers. Mother has failed to comply with court-ordered services, and she has been inconsistent with efforts to remain a part of the Child's life. The Orphans' Court found credible Ms. Felty's testimony that Mother has failed to remedy any of the issues that necessitated placement of the Child, including Mother's untreated mental health, ongoing drug use, lack of stable housing or employment, and inconsistent visits or contact with the Child. Mother's inability or unwillingness to remedy these conditions have left the Child without essential parental care, control, or subsistence necessary for her mental or physical well-being.

Accordingly, we conclude the Orphans' Court did not abuse its discretion in ordering termination under Subsection 2511(a)(2). As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

As noted above, in order to affirm a termination of parental rights, we need only agree with the Orphans' Court as to any one Subsection of 2511(a)

before assessing the determination under Subsection 2511(b), and we, therefore, need not address any further Subsections of 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Subsection 2511(b). As to Subsection 2511(b), our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In *In re E.M*, [533 Pa. 115, 620 A.2d 481, 485 (1993)], th[e] Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267 (quotation and citation omitted).

"In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Subsection 2511(b) does not require a formal bonding

evaluation." ***In re Z.P.***, 994 A.2d 1108, 1121 (Pa.Super. 2010) (citations

omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the Subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the [orphans'] court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent….

***In re Adoption of C.D.R.***, 111 A.3d at 1219 (quotation marks and quotations

omitted).

In determining that termination of Mother's parental rights favors Child's

needs and welfare under Subsection 2511(b), the Orphans' Court stated:

Mother argues that the Court erred by determining that the best interests of the Child would be served by terminating her parental rights. Pursuant to…[Sub]section 2511(b), a court must give "primary consideration to the [developmental, physical and emotional] needs and welfare of the child." ***In re J.E.***, 745 A.2d 1250, 1254-44 (Pa.Super. 2000) (citations omitted).

\*\*\*

The Court finds that the record strongly supports that the Child's developmental, physical and emotional needs and welfare are best served by termination of Mother's parental rights as is set forth in great detail above.

\*\*\*

There was little to no evidence presented at the hearing that Mother and the Child are bonded[,] and [the Orphans'] Court has considered this as a factor in determining that it is in the Child's best interest that Mother's parental rights be terminated, and that a new placement goal be established, which is adoption with a

concurrent placement goal of subsidized permanent legal custodianship.

Orphans' Court Opinion, filed 4/13/22, at 26-27.

Further, the Orphans' Court concluded that termination was in the Child's best interests since the Child was in need of a safe environment, as well as permanence and stability, which Mother was unable to provide for the Child. *See id.*

We conclude the Orphans' Court did not abuse its discretion in finding that Child's developmental, physical, and emotional needs and welfare favor termination of parental rights pursuant to Subsection 2511(b). *See In re T.S.M.*, 620 Pa. at 628, 71 A.3d at 267. The Agency presented ample evidence that the Child's daily needs were being met adequately by her foster family, the Child seeks comfort from her foster parents, and the Child refers to her foster parents as "Mommy" and "Da-da." N.T., 2/10/22, at 7-8.

To the extent Mother suggests the Orphans' Court did not adequately consider Mother's love for the Child and/or the bond between her and the Child, we disagree. The Orphans' Court considered in depth the issue of whether a bond existed and concluded there was "little to no evidence" that Mother and the Child are bonded. Orphans' Court Opinion, filed 4/13/22, at 27. Given the fact the evidence revealed the Child has spent most of her life with her foster parents, and Mother did not visit the Child in the six months prior to the instant hearing, we conclude the Orphans' Court did not err in

finding there was "little to no evidence" of a bond between Mother and the Child. *Id.*

While Mother may profess to love the Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. The Child is entitled to permanency and stability. As this Court has stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of [her] child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the Orphans' Court properly terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).[6]

For all of the foregoing reasons, we affirm the order and decree, which changed the permanency goal to adoption with a concurrent placement goal

---

[6] We note that Mother presents challenges to the credibility of various witnesses, as well as the Orphans' Court's factual findings. As indicated *supra*, the Orphans' Court is free to make credibility determinations. *In re M.G.*, *supra*. Further, we conclude competent evidence supports the Orphans' Court's findings, and thus, we must accept the factual findings. *Id.*

of subsidized permanent legal custodianship,[7] and involuntarily terminated Mother's parental rights to the Child.

Order and decree affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 08/01/2022

---

[7] We note Mother presented no argument on appeal challenging the court's changing of the permanency goal to adoption with a concurrent placement goal of subsidized permanent legal custodianship.